UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENISE JOY MEYER,

                 Plaintiff,                          Civil Action No. 10-cv-12963

              v.                                District Judge Paul D. Borman
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 16]**

Plaintiff Denise Joy Meyer ("Plaintiff" or "Claimant") brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties filed summary judgment motions, (Dkts. 11, 16) which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), (Dkts. 3, 14).

## I. RECOMMENDATION

For the foregoing reasons, this Court finds that the Administrative Law Judge's narrative fails to articulate how certain work restrictions and medical findings of examining physicians are consistent with his RFC assessment and hypothetical. Accordingly, this Court RECOMMENDS that Plaintiff's Motion be GRANTED, that Defendant's Motion for be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II.  REPORT

### A.  Procedural History

Plaintiff alleges that she became unable to work on July 26, 2005.  (Tr. 62.)[1]  Plaintiff protectively filed for disability on August 3, 2006, and the Commissioner denied Plaintiff's application on November 13, 2006.  (Tr. 15, 84.)  Plaintiff then requested a hearing, and on January 8, 2009, Plaintiff, represented by her present counsel, appeared via video conference before Administrative Law Judge ("ALJ") John Murdock, who considered the case *de novo*.  (Tr. 60-82.)  In a February 19, 2009 decision, he found that Plaintiff was not disabled.  (Tr. 15-21.)  The ALJ's decision became the final decision of the Commissioner on May 25, 2010 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on July 27, 2010.

### B.  Background

Plaintiff was 42 years old at the time of the ALJ's decision.  (Tr. 19.)  She has a high school education.  (Tr. 19.)  For over 15 years, Plaintiff had a production job at an automotive parts manufacturer.  (Tr. 133.)  There, she loaded and unloaded four machines, lifted parts that weighed six to ten pounds, and pushed wheeled carts weighing at least 100 pounds.  (Tr. 67-69.)  In February 2001, Plaintiff slipped on ice heading into her workplace and sustained back and head injuries.  (Tr. 167, 303, 310.)

#### 1.  Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that her back, knees, and headaches prevent her from working.  (Tr. 76-77.)  Regarding her knees, Plaintiff testified that pain is caused by

---

[1]Initially, Plaintiff alleged an onset date of February 5, 2001.  (Tr. 15, 128.)  At the hearing before the ALJ, however, Plaintiff amended her alleged onset date to July 26, 2005 based on when she began treatment with a neurologist and when she last worked.  (Tr. 62.)

2

rheumatoid arthritis.  (Tr. 73.)  She explained that due to the rheumatoid, her right knee becomes inflamed, and when her knee is inflamed "it's huge, you don't walk [and] you don't do a lot." (Tr. 74.)  Plaintiff attested that her doctors have noted probable joint replacement, but have thus far treated her inflamation by draining her knee.  (Tr. 73-74.)  Plaintiff further testified that while she has the most problems with the right knee, the rheumatoid arthritis is also present in her left knee, her ankles, and "partly" in her fingers.  (Tr. 73.)

Plaintiff offered very limited testimony regarding her back.  Similarly, Plaintiff's counsel and the ALJ only discussed the issue briefly.  After reviewing some of Plaintiff's medical records with Plaintiff's counsel, the ALJ concluded that while her physicians noted that Plaintiff "may" have had a fracture in her vertebrae, her "imaging studies just discuss . . . degenerative disc disease."  (Tr. 63-64.)  At the time of the hearing, Plaintiff was taking Relafen for her knee and her back.  (Tr. 74.)

When the ALJ asked Plaintiff why she could not perform work less strenuous than her prior work at the automotive parts supplier, Plaintiff testified that if there was a job where she had a sit/stand option she might be able to "go back and forth for eight hours," but she could not do so for five days straight.  (Tr. 76.)  She explained, "I mean, if I can . . . do it one day, the next day, if I do too much bending or anything, then you're in so much pain the next day, so it's hard to judge." (Tr. 76.)

### 2.  Plaintiff's Self-Completed Function Report

In a September 2006  function report, Plaintiff described her typical day, social activities, and activities of daily living.  (Tr. 141-48.)  She provided that she gets up between 8:30 to 9:30 a.m., eats a breakfast of cereal or toast, and then watches TV.  (Tr. 141.)  At 11:00 a.m. she showers and perhaps rests.  (*Id.*)  At noon she watches the news.  (*Id.*)  She then prepares dinner, and eats and/or

naps from 5:00 to 6:00 p.m. (*Id.*) She helps her husband and children with the dishes, and does a load of laundry. (*Id.*) Someone comes to Plaintiff's home "to help with heavy cleaning" but Plaintiff does light cleaning. (Tr. 142-43.) She shops for clothes and house supplies once a week. (Tr. 144.) Her hobbies include sewing, crafts, snowmobiling, and jet skiing, but because of her physical impairments, she can no longer do the latter two activities. (Tr. 145.) Social activities consist of talking on the phone, and going out to lunch once a month. (Tr. 145.)

### 3. Medical Evidence

On February 5, 2001, Plaintiff went to the emergency room for injuries arising out of a fall on the ice in her workplace parking lot. (Tr. 167, 310; *see also* Tr. 294.) Her chief complaint was "pain to the back of the head." (Tr. 167.) The next day, the hospital ordered two CT scans of Plaintiff's head; both were negative. (Tr. 170, 172, 174.) Cervical spine x-rays were also negative, with "no evidence of fracture or dislocation." (Tr. 171.) Plaintiff was discharged the next day. (Tr. 169.) On February 7th, x-rays were taken of Plaintiff's lumbar spine, which revealed "no significant abnormality." (Tr. 176.)

Although Plaintiff's long-time general treating physician was Dr. Richard Schultz at Saint Mary's Chesaning Health Center, from March 2001 to January 2003, Dr. Kevin Brown, a physiatrist, primarily treated Plaintiff's back. (*See* Tr. 241, 244, 287.) On March 7, 2001, Plaintiff presented to Dr. Brown with a "shooting pain" down her right leg, "back pain, pressure sensation in the low back, and some pain with walking and standing activities." (Tr. 180.) Upon exam, Dr. Brown noted that Plaintiff had some pain with lumbar extension and her "side bending" was half of the expected range. (Tr. 181.) He also noted that Plaintiff had "weakness of the right quadriceps," but a satisfactory gait. (Tr. 181.) X-rays of Plaintiff's lumbar spine revealed "a questionable pars defect

4

at [the] L5-S1 [vertebrae] and also some degenerative disc disease at L5-S1." (Tr. 81.) Dr. Brown

concluded that Plaintiff needed "further workup," including MRI and EMG studies. (Tr. 181.)

During spring 2001, Plaintiff visited Dr. Brown a number of times. (Tr. 177.) On March

26, 2001, Dr. Brown reviewed the ordered MRI and noted "nothing in the way of any impingement,

disc herniation, or major spinal stenosis in terms of any impingement problems." (Tr. 177.) Dr.

Brown also performed EMG and nerve conduction testing. (Tr. 177.) His impression was "[n]ormal

EMG study other than decreased recruitment activity in right lower extremity muscle groups. . . .

Normal nerve conduction studies with no evidence of neuropathy." (Tr. 177.) In an April 2001

exam, Dr. Brown found that Plaintiff had diminished forward flexion, and "some tenderness in the

right [sacroiliac] area." (Tr. 179.) Similarly, May 2001 exam notes provide that Plaintiff was

"tender in the right [sacroiliac] area. She has spasm in the right lumbar area." (Tr. 179.) Dr. Brown

recommended physical therapy. (Tr. 178-79, 276.)

Plaintiff's condition improved through physical therapy at the Memorial Healthcare Center

during summer 2001, but it worsened again by fall. (Tr. 185, 200, 203-07.) On July 12, 2001, a

physical therapist assistant noted that "[p]atient has shown substantial progress since the start of

therapy." (Tr. 207; *see also* Tr. 182; Tr. 273.) Plaintiff returned to Dr. Brown in October 2001 with

reports of worsening back pain, however. (Tr. 185.) Upon exam, Dr. Brown noted "pain with knee

extension on the right. Forward flexion is diminished. Gait findings are satisfactory." (Tr. 185.)

His plan was to restart physical therapy. (Tr. 175.)

In December 2001, Plaintiff reported that she was still experiencing back pain despite

finishing another round of therapy. (Tr. 183.) Dr. Brown's exam revealed "some bilateral muscle

spasm which is palpable today in the lumbar region." (Tr. 183.) Plaintiff's forward flexion was half

of the expected range, but he found her lower extremity range of motion "satisfactory." (Tr. 183.) Dr. Schultz also examined Plaintiff around this time and he noted, "bilateral lower paraspinal muscle tenderness, tender lumbar spinous process, full range of motion, normal stability, normal strength and tone." (Tr. 245.)

Plaintiff continued therapy at Memorial Healthcare into 2002, and on January 29, 2002 she reported to her therapist that she had "significant improvement under current therapy." (Tr. 188.) She was able to perform regular activities of daily living without significant difficulties, "but heavy household activities increase[d] pain." (Tr. 188.) Dr. Brown contemporaneously noted that "General Motors has not been able to provide [Ms. Meyer] with lighter duty work activities. I feel she would be able to go back to those, although she does have an ongoing component of back pain." (Tr. 211.)

Plaintiff returned to work for three days in February 2002, but on February 25, 2002 she reported to her therapist that "her condition flared up with severe pain in [her] low back." (Tr. 197.) Dr. Brown's contemporaneous notes provide that Plaintiff "was in an easier job apparently with inspection-type activities, nothing really very strenuous" but "she was aggravated a little bit by the periods of sitting activities." (Tr. 210.) An April 2002 medical record (possibly an imaging study), provides that Plaintiff had "[e]ssentially normal examination except for slight narrowing at the L5-S1 disc space, possibly developmental." (Tr. 268.)

Plaintiff continued treatment with Dr. Brown through the remainder of 2002. Dr. Brown's October 2002 notes provide that Plaintiff had a significant "flareup about three weeks ago" and that Plaintiff had "diminished forward flexion," sacroiliac pain and tenderness, but that Plaintiff "ambulates satisfactory with good gait findings." (Tr. 214.) In December 2002, Plaintiff reported

6

"difficulty with headaches."  (Tr. 213; *see also* Tr. 239 (reporting headaches to Dr. Schultz).)

During that exam Dr. Brown noted,

> I am going to recommend that [Ms. Meyer] go back on a trial of work
> activities and see how she does with this.  I will release her at this
> point in time to some lighter duty work, something under 15 pounds
> with no repetitive part handling and no repetitive bend/twist
> activities, something more like an inspection job if the plant can
> provide this for her.

(*Id.*)  Dr. Brown's last treatment note, dated January 9, 2003, provides that Plaintiff was back at

work on a "light duty" job.  (Tr. 212.)

The record also contains relevant medical records from Dr. Schultz, Plaintiff's long-time

general-practice physician.  In July 2002, Dr. Schultz referred Plaintiff to Dr. B. Srinivasan.  Dr.

Srinivasan found that Plaintiff's MRI was normal, but that "she has marked muscle deconditioning

of lower back muscles with marked tenderness over the lower lumbar facet area, as well as sacroiliac

joint areas bilaterally, more so on the right."  (Tr. 279.)  In December 2002, Dr. Schultz prescribed

Darvocet-N for Plaintiff's headaches and Motrin for her sprained/strained sacroiliac.  (Tr. 240.)

Although Plaintiff had returned to work in January 2003, the administrative record reflects

that her return was short-lived.  Plaintiff presented to Dr. Schultz with muscle spasms in her lower

back which were "shooting up into her shoulder blade area."  (Tr. 233.)  Although Dr. Schultz's

handwritten notes are difficult to decipher, it appears that he found tenderness over Plaintiff's mid-

and upper-back.  (Tr. 234.)  Dr. Schultz wrote a note indicating that Plaintiff could not work until

February 3, 2003. (Tr. 333.)  In March 2003, Dr. Schultz made findings similar to those in the

January exam.  (Tr. 232.)  On September 25, 2003, Dr. Schultz completed a form for the Delphi

Hourly-Rate Employees Pension Plan.  (Tr. 286-87.)  He checked a box indicating that Plaintiff was

"not able to engage in any occupation or employment for wage or profit" and indicated that she had

been disabled since April 6, 2003. (Tr. 287.) When asked for evidence supporting his diagnosis, Dr. Schultz provided, "tender [lumbosacral] spine, [sacroiliac] joint [illegible,] MRI, EMG, x-rays." (Tr. 287.) The form indicates however, that Plaintiff would eventually be able to resume "gainful employment" of some kind. (Tr. 287.) GM/Delphi medical records reflect that given Plaintiff's restrictions, no jobs were available to her from spring 2003 onward. (Tr. 334-349, 351-361; *but see* Tr. 350 ("return to work with restriction" in August 2005 followed by "no job available" in subsequent records).)

In addition to treatment from Drs. Brown and Schultz, from the time of Plaintiff's fall through September 2006, physicians for Plaintiff's employer, GM/Delphi, regularly evaluated Plaintiff. (Tr. 280-83, 323-403.) In the overwhelming majority of these visits—over 30—Dr. Kirk Herrick examined Plaintiff. (*See* Tr. 218, 323-387.) For the year following the accident, Dr. Herrick typically restricted Plaintiff to a lift limit of 5 pounds, limited bending and twisting, and a sit/stand option. (Tr. 367-68.) Starting in March 2002, Dr. Herrick changed Plaintiff's work restrictions to a 15-pound lift limit with no repetitive bending and twisting. (Tr. 368-69.) In early 2003, Dr. Herrick referred Plaintiff to "Work-Fit" for physical therapy. (Tr. 218-24.) The last therapy session note provides that "[employee] has made no noticeable improvement with therapy sessions." (Tr. 224.) In December 2004, Dr. Herrick found "severe spasm and tenderness of neck and [lumbosacral] area of spine." (Tr. 282.) Similarly, in November 2005, he found "tenderness and spasm [lumbosacral] area and [cervical] spine numbness of left arm also." (Tr. 280.) Plaintiff remained restricted to no repetitive bending and twisting and a 15-pound lift limit. (Tr. 368-69.)

Starting in July 2005, and continuing through September 2007, Dr. Gavin Awerbuch, a neurologist, treated Plaintiff. (Tr. 296-304, 415-21.) During a July 26, 2005 exam, Plaintiff

8

reported to Dr. Awerbuch that she experienced "headaches [that] begin at the neck and base of the skull and radiate upwards. . . .  At times, she will develop nausea and vomiting with her headaches. . . .  Headaches last for up to three hours and she has to lie in a dark room and try to sleep."  (Tr. 303.)  Regarding her back, Plaintiff reported that her legs occasionally get numb, and "[s]he has pain when she bends, twists, or stands.  She has to frequently change positions, sit or lie down during the day."  (Tr. 303.)  On exam, Dr. Awerbuch found:

> mild flattening of the lordosis.[2]  There are palpable spasms.  She has pain with palpation of the facet and sacroiliac joints.  She can forward flex about 30 degrees, extend about 20 degrees, and lateral bending is about 5 degrees.  Straight leg raising produces back pain bilaterally with radiation into the hip and upper thigh at about 70 degrees.  She has difficulty walking up on her heels and toes due to pain.

(Tr. 303.)  Dr. Awerbuch believed further investigation by EMG was appropriate, and on September 7, 2005, he performed an EMG on selected muscles of Plaintiff's back.  (Tr. 296.)  His impression was that the EMG was normal with no "electrodiagnostic evidence o[f] radiculopathy, plexopathy, or mononeuropathy."  (Tr. 296.)  That day, Dr. Awerbuch also renewed Plaintiff's prescriptions for Celebrex and Imitrx and added Darvocet.  (Tr. 302.)

In March 2006, Plaintiff reported to Dr. Awerbuch that she has to "frequently change position[s] and lie down during the day," and that she "can only stand or walk for short distances."  (Tr. 300.)  On exam, Dr. Awerbuch found that Plaintiff had "trouble standing from a chair and she initially walks with a limp.  Straight leg raising is negative today.  There is no motor weakness."  (Tr. 300.)  He noted that Plaintiff "has limited her ability to stand, walk, bend, twist, and she cannot

---

[2]*Stedman's Medical Dictionary* (27th ed. 2000) (defining "lordosis" as "[a]n anteriorly convex curvature of the vertebral column; the normal lordoses of the cervical and lumbar regions are secondary curvatures of the vertebral column, acquired postnatally.").

return to work in an unrestricted fashion." (Tr. 300.)

From March 2006 through September 2006 (the last of Dr. Herrick's notes available in the administrative record), Dr. Herrick's work restrictions changed through the addition of a sit/stand option. (Tr. 356-60, 370, 371, 376, 381-82, 387.) This is consistent with Plaintiff's reported symptoms during Dr. Awerbuch's March 2006 exam and the swelling in Plaintiff's right knee treated by Dr. Rene. (Tr. 306.) In March 2006, Dr. Herrick assessed Plaintiff with lumbosacral strain, cervical strain, and "[degenerative joint disease] of [the] knee." (Tr. 387.)

In June 2006, Dr. Awerbuch's impression was "[p]osttraumatic back pain with facet syndrome, radiculopathy, and soft tissue dysfunction[;] [h]ead injury, concussion migraines, vertigo, and imbalance[;] and [r]ight knee derangement." (Tr. 299.) Plaintiff believed that her "symptoms were relatively stable and tolerable with limited activity and medicine." (Tr. 299.) Dr. Awerbuch advised [Plaintiff] "to apply for total and permanent disability." (Tr. 299.)

In November 2006, Mr. Denny Hall completed a Residual Functional Capacity Assessment form for the Michigan State Disability Determination Services. (Tr. 404-11.) He found that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand and/or walk "at least 2 hours in an 8-hour workday" (but not 6 hours in an 8-hour workday), and could sit for about 6 hours in an 8-hour workday. (Tr. 405.) Mr. Hall also limited Plaintiff to occasional climbing of ramps and stairs, with no kneeling, crouching, or crawling. (Tr. 406.)

From December 2006 through September 2007, Dr. Awerbuch made fairly consistent findings. In December 2006, Plaintiff reported that her back pain worsened if she sat or stood for prolonged periods. (Tr. 419.) Dr. Awerbuch found that Plaintiff's lumbar range of motion was reduced, and that Plaintiff had mild spasms and difficulty squatting. (Tr. 419.) He prescribed

10

Celebrex and Skelaxin and noted that Plaintiff was "to stay off work." (Tr. 419.) In June 2007, Plaintiff reported "occasional headaches, imbalance, and vertigo," knee and back pain, and "good and bad days." (Tr. 417.) She told Dr. Awerbuch that "[s]he is able to manage quite well by eliminating her activities." (Tr. 417.) In September 2007, Dr. Awerbuch found that Plaintiff had difficulty rising from a chair, had a "reduced lumbar range of motion," and "[p]ositive straight leg raising bilaterally." (Tr. 416.)

### 4. *Vocational Expert's Testimony*

Vocational Expert ("VE") Stephanee Leech testified at the January 8, 2009 hearing before the ALJ. She stated that Plaintiff's past work "was [as] a grinder operator" which was "medium, semi-skilled work." (Tr. 78.) The ALJ then asked the VE if jobs would be available for a hypothetical individual, similar in age and education to Plaintiff, limited to light work with no "industrial climbing, that is, ropes, ladders and scaffolds," no crawling, only occasional "other posturals of other climbing, balancing, stooping, kneeling and crouching," and who should avoid "extreme cold and vibration and hazardous machinery and heights." (Tr. 78.) The VE responded that there would be 130,000 "office or similar positions," 120,000 "inspector" positions, 180,000 "packer" positions, and 68,000 "reception and information clerk" positions in the national economy. (Tr. 79.) The VE further testified that most of these jobs are "entry-level, unskilled jobs." On cross, the VE agreed with Plaintiff's counsel that if a person needed to lie down at times outside of the typical workday breaks, the person would be precluded from work. (Tr. 81-82.)

11

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since February 5, 2001 (Plaintiff's original alleged onset date).  (Tr. 17.)  At step two, he found that Plaintiff had the following severe impairments: "arthritis of the knee, back pain, and migraines." (*Id.*)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (*Id.*)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "light work as defined in 20 CFR 404.1567(b) except [only] occasional climbing without using any ropes, ladders, or scaffolds; occasional balancing, stooping, kneeling, and crouching, but no crawling; and [must have a] work environment without extreme cold, vibration, or hazardous conditions including machinery and heights." (Tr. 18.)  At step four, the ALJ found that Plaintiff could not perform any past relevant work.  (Tr. 19.)  At step five, he relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform, including, office clerk, inspector, packer, and a reception/information clerk.  (Tr. 20.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence

13

in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal

quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an

agency has failed to adhere to its own procedures, we will not remand for further administrative

proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights

because of the agency's procedural lapses." (internal quotation marks omitted)).   Substantial

evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.

Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).   In

deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case

de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499

F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the

reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is

limited to an examination of the record and must consider that record as a whole.   *Bass*, 499 F.3d

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).   The Court

"may look to any evidence in the record, regardless of whether it has been cited by the Appeals

Council." *Heston*, 245 F.3d at 535.   There is no requirement, however, that either the ALJ or this

Court discuss every piece of evidence in the administrative record.   *Kornecky v. Comm'r of Soc.

Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without

directly addressing in his written decision every piece of evidence submitted by a party." (internal

quotation marks omitted)).   If the Commissioner's decision is supported by substantial evidence, "it

must be affirmed even if the reviewing court would decide the matter differently and even if

14

substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

**F. Analysis**

Plaintiff asserts that the ALJ improperly evaluated two sets of medical evidence: the medical records from Dr. Awerbuch, Plaintiff's treating neurologist, and those from Dr. Herrick, a GM/Delphi physician who saw Plaintiff on at least 30 occasions. (*See* Pl.'s Mot. Summ. J. at 9-11.) Perhaps because Plaintiff muddied the waters by unnecessarily citing the reasons-giving requirement of the treating physician rule, the Commissioner was misled in framing the issue before this Court.[3] The Commissioner asserts that "Plaintiff's main argument on appeal is that the ALJ improperly rejected the evidence from Dr. Auerbach [*sic*] and the doctors at Plaintiff's employer." (Def.'s Mot. Summ. J. at 7.) But the ALJ did not reject the evidence from Drs. Awerbuch and Herrick. In fact, the ALJ had no reason to reject the doctors' findings because he concluded that his RFC was

---

[3]Generally, greater deference is given to the opinions of a treating physician than to those of a non-treating physician; this is commonly known as the treating physician rule. *See* 20 C.F.R. 404.1527(d)(2); SSR 96-2p; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, "the [ALJ's] decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188 at *5; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). In this case, the ALJ did not reject or discount any treating source opinion but instead found that Plaintiff's physicians' findings were consistent with his RFC. Accordingly, he had no reason to explain how much weight he gave their findings or why he assigned a treating source particular weight.

*consistent* with the findings of the two physicians:

> Per GM Delphi's notes, [claimant] was restricted from repetitive tasks, and limited lifting, *that is within the RFC*. . . .   As for the opinion evidence, substantial weight was given to Dr. Awerbuch, because he treated the claimant and *did not restrict her to anything less [than] the RFC*.

(Tr. 19.)  Plaintiff's point on appeal is that these two factual findings are inaccurate—i.e., that Drs. Awerbuch and Herrick's findings are not within the RFC—and that "the ALJ had a duty to explain why the RFC is different than the restrictions given to Ms. Meyer on a rather consistent basis from examining and treating physicians."  (*See* Pl.'s Mot. Summ. J. at 11.)  According to Plaintiff, because these two factual findings may affect the accuracy of the ALJ's RFC assessment (and hypothetical) the ALJ's procedural error requires remand.  (*See* Pl.'s Mot. Summ. J. at 6-8.)  The Court agrees.

        An "'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'"  *Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).  Further, this "'court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result.'"  *Pollaccia v. Comm'r of Soc. Sec.*, No. 09-cv-14438, 2011 WL 281044, at *6 (E.D. Mich. Jan. 6, 2011) *report adopted by* 2011 WL 281037 (E.D. Mich. Jan. 25, 2011) (quoting *Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1080 (E.D. Wisc. 2009)); *see also Grandchamp v. Comm'r of Soc. Sec.*, No. 09-cv-10282, 2010 WL 1064144, at *10 (E.D. Mich. Jan. 25, 2010) *report adopted in relevant part by* 2010 WL 1064138 (E.D. Mich. Mar. 22, 2010) ("'While the ALJ is not required to address every piece of

evidence, he must articulate some legitimate reason for his decision. Most importantly he must build an accurate and logical bridge from the evidence to his conclusion.'" (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Moreover, SSR 96-8p provides that an ALJ's RFC assessment

> must include a narrative discussion *describing how* the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). . . . The adjudicator must also *explain how* any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *7 (emphases added).

The ALJ's RFC (and hypothetical) restricted Plaintiff to "light work" (Tr. 18), which involves

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 CFR § 404.1567(b); *see also* S.S.R. 83-10, 1983 WL 31251, at *5 ("Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.").[4]

---

[4]The ALJ further narrowed the range of light work by additionally limiting Plaintiff to occasional climbing without using any ropes, ladders, or scaffolds; occasional balancing, stooping, kneeling, and crouching, but no crawling; and working in an environment without extreme cold, vibration, or hazardous conditions (including machinery and heights). (Tr. 18.) Given that Plaintiff's points of error focus on the ALJ's lifting, standing, and walking limitations, these additional restrictions are not particularly relevant.

17

Upon reviewing Dr. Herrick's medical records, the Court cannot determine how the ALJ reached the conclusion that Dr. Herrick's limitations were "within" the above RFC. From February 2001 to February 2002, Dr. Herrick limited Plaintiff to a 5 pound "lift limit." (Tr. 367-68.) From that point forward, including times prior to and after the alleged onset date, he limited Plaintiff to a 15-pound lift limit. (Tr. 369-70; *see also* Tr. 349, 350 (5- and 10- pound lift limits), 351-62.) In a footnote, the Commissioner argues that Dr. Herrick's 15-pound lift limitation is "generally consistent" with the ability to lift 20 pounds occasionally because the limitation does not further indicate how often Plaintiff could lift that weight. (Pl.'s Mot. Summ. J. at 9 n.6.) But even if Plaintiff could lift 15 pounds with some regularity, this does not necessarily mean that Plaintiff could perform all the lifting limitations of light work. *See Collette v. Astrue*, No. 2:08-CV-085, 2009 WL 32929, at *9 (E.D. Tenn. Jan. 6, 2009) ("The ALJ restricted plaintiff's RFC to no more than the full range of light work. . . . However, [an examining physician] opined that plaintiff could 'lift 15 pounds occasionally.' That opinion is inconsistent with the full range of light work, and the ALJ did not sufficiently articulate why he found the lifting opinion of [a] nonexamining [physician] to be more credible than the opinion of [the] examining [physician]."); *Vinson v. Astrue*, No. 1:07-CV-213, 2008 WL 4442504, at *3 (E.D. Tenn. Sept. 24, 2008) ("The ALJ determined Plaintiff's limitations restrict her to lifting 15 pounds occasionally, 10 pounds frequently, sitting up to six hours, and standing and/or walking up to four hours. . . . [A] person with those restrictions cannot fully do a job that is designated as requiring light work. [The] regulations define light work as lifting no more than 20 pounds at a time . . . and state the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." (internal quotation marks omitted)); *Daniels v. Comm'r of Soc. Sec.*, No. 08-cv-12292, 2009 WL

18

1044833, at *3 (E.D. Mich. Apr. 20, 2009) ("The VE found that the hypothetical individual would

be unable to perform . . . exertionally medium or light work due to the 15-pound weight limitation

as well as the ability to handle, finger, or feel objects on an occasional basis only").  Moreover, the

Commissioner's frequency-based argument on appeal is not an explanation provided in the ALJ's

narrative.  *See Marok v. Astrue*, No. 5:08CV1832, 2010 WL 2294056, at *8-9 (N.D. Ohio June 3,

2010) ("[C]ourts apply a harmless error analysis cautiously, taking care to avoid rewriting an ALJ's

decision post hoc even when substantial evidence exists to support the ALJ's decision.").

   In addition, although the ALJ apparently minimized the importance of the materials from Dr.

Herrick by referring to them as "GM Delphi's notes," they were in fact medical records created by

a physician who examined Plaintiff.  In fact, as noted, Dr. Herrick saw Plaintiff at least 30 times

over a 5-year period.[5]  Further, Dr. Brown, whom the ALJ accorded "great weight" (Tr. 19),

provided an assessment that is in accord with Dr. Herrick's assessment: "I will release her at this

point in time to some lighter duty work, something under 15 pounds . . . ."  (Tr. 213.)  The only lift

limitation contrary to Dr. Herrick's was that of the State DDS consultant, Mr. Denny Hall, who

found that Plaintiff could lift 20 pounds occasionally.  (Tr. 405.)  But the Commissioner himself

states that Mr. Hall was a "layperson" and that the "Commissioner does not rely on [his]

---

[5]Arguably, Dr. Herrick was even a treating physician.  *See* 20 C.F.R. § 404.1402 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment *or evaluation* and who has, or has had, an ongoing treatment relationship with you."); 20 C.F.R. 404.1527(d)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, *longitudinal picture of your medical impairment(s)* and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").  The Court makes no ruling on this issue but leaves it for the ALJ to address on remand.

statement . . . as support for the ALJ's decision."  (Def.'s Mot. Summ. J. at 7 n.5.)[6]  Given the

frequency that Dr. Herrick evaluated Plaintiff, and that no other medical professional contradicted

his lift limitation, his 15-pound restriction was entitled to significant weight, and the ALJ had a duty

to explain how it is "within" the RFC.

In addition, the ALJ's narrative does not provide the Court a logical bridge between, on the

one hand, the omission of a sit/stand option and (as light work requires) the ability to do "a good

deal of walking or standing," 20 C.F.R. § 404.1567(b), or "standing or walking, off and on, for a

total of approximately 6 hours of an 8-hour workday," S.S.R. 83-10, 1983 WL 31251, at *5, and,

on the other hand, the medical evidence from Drs. Herrick and Awerbuch.  From April 3, 2006

though October 2, 2006, Dr. Herrick included a work restriction of a "sit/stand option."  (Tr. 370.)

Around the same time, Plaintiff reported to Dr. Awerbuch that she had to "frequently change

positions, sit or lie down during the day," that her "pain is worse if she sits or stands for prolonged

periods," and that she "can only stand and walk for short distances."  (Tr. 300, 419-20; *see also* Tr.

303.)  Although the Commissioner correctly states that these were self-reported symptoms and

limitations (Def.'s Mot. Summ. J. at 8), Dr. Awerbuch made findings—undiscussed by the

ALJ—that may support Plaintiff's asserted limitations.  In September 2005, Dr. Awerbuch noted

that Plaintiff had difficulty performing "tandem."  (Tr. 302.)[7]  In March 2006, his exam revealed that

---

[6]Mr. Hall found that while Plaintiff could stand and/or walk "at least 2 hours in an 8-hour workday" he could not do so for 6 hours in an 8-hour workday.  (Tr. 405.)  As discussed immediately below, this is in tension with the standing and walking requirements of light work. Thus, to the extent that the ALJ did rely upon Mr. Hall's opinion regarding Plaintiff's ability to lift 20 pounds occasionally, he provided no explanation as to why he departed from that opinion's standing and walking limitations.

[7]*Dorland's Illustrated Medical Dictionary* 765 (31 ed. 2007) (defining "tandem gait" as "a gait used in neurologic assessments; the patient is told to walk in a straight line and at the end of

Plaintiff "has trouble standing from a chair and she initially walks with a limp." (Tr. 300.) In June 2006 he found that Plaintiff could not perform tandem. (Tr. 299.) In September 2006 he noted antalgic gait. (Tr. 420.)[8] While substantial evidence may ultimately support an RFC that omits a sit/stand limitation and includes "a good deal of walking or standing," the ALJ had a duty to provide this Court some minimal explanation of how the findings of Drs. Herrick and Awerbuch square with his RFC. *See Lowery*, 55 F. App'x at 339 (noting that an "'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'").

## G.  Conclusion

For the foregoing reasons, this Court finds that the ALJ's narrative fails to articulate how certain work restrictions and medical findings of examining physicians are consistent with his RFC assessment and hypothetical. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

---

each step touch the heel of the foot in front to the toe of the foot behind").

[8]*Stedman's Medical Dictionary* (27th ed. 2000) (defining "antalgic gait" as "a characteristic gait resulting from pain on weightbearing in which the stance phase of gait is shortened on the affected side").

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. A copy of any objections is to be served upon this magistrate judge. E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: June 9, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 9, 2011.

s/Jane Johnson
Deputy Clerk